## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| ADAM YOUNGER,<br>111 Old Army Rd.<br>Scarsdale, NY 10583<br><br>Plaintiff,<br><br>v.<br><br>CASE WESTERN RESERVE<br>UNIVERSITY,<br>10900 Euclid Ave,<br>Cleveland, OH 44106<br><br>Defendant | Case No. 1:19-cv-1800<br><br>Judge:<br><br>COMPLAINT AND JURY DEMAND |

1.      Plaintiff Adam Younger ("Younger") attended Defendant Case Western Reserve University ("CWRU") from fall 2010 to spring 2015, graduating with a Bachelor's degree in political science with no record of disciplinary action on his official transcript.

2.      Unbeknownst to Younger, CWRU had erroneously found him "responsible" for a crime and rule violation, namely "DRUGS," its rule prohibiting possession, use, distribution, and possession of drugs and drug paraphernalia.  Without ever notifying Younger, CWRU entered this finding on a campus drug charge on or around March 21, 2013.

3.      Christopher Beyer, CWRU's Manager of Upper-Class Residents and Assistant Director of Residence Life, one of CWRU's officials in its burgeoning administrative bureaucracy, quickly identified one of Younger's roommates, who admitted the paraphernalia was his own.  At no time did CWRU allege that Younger had drugs or paraphernalia or used them.  No evidence suggested he did.  Mr. Beyer even promised Younger that he would clear him of suspicion if

Younger cooperated with CWRU's campus quasi-judiciary in the investigation and prosecution, which Younger did.

4.     In violation of CWRU's policies and this express promise, Mr. Beyer and CWRU found Younger guilty of violating its drug rule, without holding a judicial hearing, in defiance of clear evidence that the drug paraphernalia belonged to another student, and despite Younger's cooperation.

5.     CWRU's arbitrary actions only came to light years later when Younger began to apply for jobs in federal law enforcement, only to find that CWRU's erroneous determination that he had committed a crime now interferes with his career.

PARTIES

6.     Plaintiff Adam Younger ("Younger") is a resident of Scarsdale, New York.

7.     Defendant Case Western Reserve University ("CWRU") is a university with its principal place of business in Cleveland, Ohio.

JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity.  Younger is a resident of New York.  Defendant has a principal place of business in Ohio. The amount in controversy exceeds $75,000.

9.     Venue is proper in the Federal District Court for the Northern District of Ohio under 28 U.S.C. § 1391(b) because Defendant resides within the jurisdiction of this Court, and a substantial part of the acts and omissions giving rise to Plaintiff's claims took place within the jurisdiction of this Court.

FACTS

### A. The Drug Charge

10.     Plaintiff Adam Younger matriculated as a freshman at CWRU in fall 2010 and graduated in 2015 as a student in good standing with a B.A. in Political Science.  Younger was twice placed on the Dean's Honor Roll.

11.     Younger took the rules of conduct at CWRU very seriously.  He and served as a member of CWRU's University Conduct Board, CWRU's Sexual Misconduct and Community Standards Board (charged with adjudicating Title IX claims), and CWRU's Interfraternity Greek Life Judicial Board.  He was also the Chief Judicial Officer of the undergraduate student government.

12.     In the spring of his junior year, Younger lived with eight fellow upperclassmen in a dorm suite of CWRU known as the "Northern Residential Village" ("NRV"), House 7.  The suites of the NRV included multiple private rooms in an up-down, two-story arrangement with shared common areas such as a kitchenette, living room, and bathrooms.

13.     At approximately 2:24 PM on March 21, 2013, CWRU police responded to NRV House 7 after being notified by staff responsible for cleaning common areas of the NRV that an odor of marijuana was coming from inside.  There is no dispute that Younger was not present in House 7 at this time.

14.     The Manager for Upper-Class Residences Beyer met the police at the residence and entered Younger's suite.  In a common-area bathroom, Mr. Beyer claimed to have discovered a 20-ounce Mountain Dew bottle which had been modified to smoke marijuana by the insertion of a ratchet socket.  The police confiscated this make-shift "bong" and logged it into evidence.

15.     The bong discovered in the common area of House 7 did not belong to Younger. At no time did Younger possess or maintain possession of any drug paraphernalia or drugs.

3

16.    That day, a Thursday, Mr. Beyer wrote to all nine residents of his suite:

I am asking that whoever was responsible for this to please let me know.  If someone does not claim responsibility for this by Monday, I will plan to schedule meetings with everyone once again.

If you are not responsible for this, I would suggest you encourage your roommates to be honest this time and accept responsibility.

Younger and his suitemates had four days to come forward.

17.    This had also been the second time that Mr. Beyer and CWRU's campus judiciary and police had received complaints about a marijuana smell coming from Suite 125.  CWRU investigated the prior incident but found that all students, including Younger, were not responsible for any violation.

18.    CWRU did not maintain a policy of holding all students collectively responsible for code violations of a single student, where evidence did not permit CWRU to identify the guilty party.

19.    The next day (March 22, 2013), Younger wrote to Mr. Beyer, "I am unsure of how I, personally, should proceed.  Because this is the second time this has happened, quite frankly, I'm frustrated with being thought of as responsible just because of association, I think it might be best for me to consider changing suites."

20.    Mr. Beyer responded, "Your best recourse is to speak with your roommates and express your expectation that the responsible person (or people) contact me to claim responsibility so that the rest of you don't have to go through this again."  Mr. Beyer made clear in this message and through oral communications to Younger and the other residents of the suite that they should either identify the student or have the student whose paraphernalia had been found in their residence admit responsibility.  If the responsible party came forward, Mr. Beyer indicated that the others would not have to go through any further ordeal.

4

21.     By Monday (March 25, 2013), one of the suitemate's came forward to accept responsibility for the bong.

22.     Even though this cleared the matter and the students had done exactly as Mr. Beyer had asked them to do, Mr. Beyer nevertheless proceeded to schedule meetings with all residents of the suite for April 3, 2013.  Mr. Beyer styled this an "Administrative Hearing" under his authority within the Division of Housing, Residence Life & Greek Life.

23.     Mr. Beyer wrote by email of March 29, 2019:

> Because this situation involves a possible violation of the Case Western Reserve University Standards of Conduct (#9 - Violations of published University Rules and Regulations), an Administrative Hearing has been scheduled to determine your involvement in the incident and whether you are responsible for any violations of Housing, Residence Life & Greek Life policy.  Specifically, you are alleged to have violated the following policy(ies):
>
> Drugs
>
> An Administrative Hearing is a formal meeting during which we will discuss the incident and alleged policy violation(s).  During this hearing I will review and consider all available information before making a determination of whether any policies were violated, and if so, what sanctions would be appropriate.  For further information, please refer to the Residence Hall Policies at:
>
> http://studentscase.edu/handbook/policy/

24.     Mr. Beyer styled his administrative proceedings against Younger and his suitemates as violations of Housing, Residence Life & Greek Life Policy, subject to CWRU's Housing, Residence Life & Greek Life ("HRLGL") Hearing Process, as specified in its 2012-2013 Student Handbook ("Handbook").  He titled his "notice" to Younger, "Housing & Residence Life Judicial."

25.     Mr. Beyer was not abiding by CWRU's policies because the "DRUGS" violation of which Younger and his suitemate were accused is not a housing violation.  It is a violation of university-wide policies set forth in the Handbook, under which Younger and his suitemates were

entitled to the procedural protections of the University Student Affairs Hearing Process.  HRLGL policies can, at most, lead to the termination of university lease contracts with students for dormitory residences.

26.     A DRUGS charge may lead to disciplinary probation, suspension, or expulsion.  It is a serious CWRU conduct code violation and entitles the student the right to be heard by the University Student Affairs Judicial Board.

27.     During Younger's only meeting with Mr. Beyer (on April 3, 2019), Mr. Beyer again assured him that if he honestly identified the student who kept the paraphernalia at the suite, he would not be found responsible.  CWRU was interested only in identifying the responsible student, not in collective punishment by association.  Mr. Beyer had already received the admission of the guilty student and knew the bong did not belong to Younger, but he sternly warned Younger that he had a choice: 1) Younger could stay silent, be uncooperative, and be found responsible for the drug paraphernalia as if it were his own, or 2) Younger could turn in the student to Mr. Beyer in exchange for being found *not* responsible and Mr. Beyer would help Younger move into a different suite arrangement.  Above all, Younger wanted to avoid association with this kind of conduct because he was considering a future career in criminal law and law enforcement.

28.     Younger identified the suitemate.  Younger offered to take a drug test to prove that he was not using marijuana, which Mr. Beyer declined.  Mr. Beyer assisted Younger in moving to a different unit on campus.  This was the last Younger heard of the incident until many years later. He assumed, as Mr. Beyer had promised, that he had been cleared of charges.

29.     Just over two weeks later, CWRU appointed Younger to its University Conduct Board, on which he served as a Student Representative Board Member, and later Chairman, through May 2014.  This Board was and is an extension of CWRU's expansive quasi-campus judiciary.

6

CWRU would not have appointed Younger to the very Board that enforces serious rules violations had it actually found him guilty of a DRUGS violation.  In fact, students who are sanctioned for serious infractions resulting in disciplinary probation, suspension, or expulsion may be summarily removed from the Board.  Had CWRU considered Younger guilty of a serious violation such as "DRUGS," Younger could not have served on this board.  Yet CWRU appointed him to serve on this board—with the full knowledge of Mr. Beyer and other administrators responsible for CWRU's campus quasi-judiciary.  Younger subsequently served on CWRU's Sexual Misconduct and Community Standards Board, it's Greek Life Judicial Board, and served as the undergraduate student government's Chief Judicial Officer.

## B.  Six Years Later, Younger Discovers That CWRU Found Him Guilty of a Drug Charge

30.     During his time as student at CWRU, Younger wished to serve his country and the law.  He had already begun contemplating a career in federal law enforcement, which he hoped to combine with a law degree.

31.     In the past year and in fulfillment of this long-held career ambition, Younger began to apply for Special Agent/Criminal Investigator positions with the Federal Bureau of Investigation, the Naval Criminal Investigative Service, the Drug Enforcement Administration, and Homeland Security Investigations, housed within Immigration and Customs Enforcement of the Department of Homeland Security.

32.     These applications required Younger to answer questions such as whether he had ever been found responsible for drug use or illegal possession of drugs and paraphernalia, not only by law enforcement but in college.

7

33.     On or around June 2, 2019, in preparation for interviews scheduled with the FBI and other federal law enforcement agencies, Younger requested his full disciplinary record from CWRU under the Family Educational Rights and Privacy Act.  Only then did he discover, through an email response from a CWRU administrator, that CWRU had, erroneously and in breach of its promises, entered a finding of "Responsible" against Younger for an unspecified "drug violation."  CWRU had never notified Younger of this outcome, and CWRU certainly did not notify Younger that CWRU found him responsible for violating its DRUGS rule.

34.     On June 21, 2019, CWRU administrator and member of its quasi-campus judiciary, George O'Connell, Director of CWRU's Office of Student Conduct and Community Standards (who was not on staff with CWRU in 2013) responded that CWRU would not allow Younger to appeal and would not correct the erroneous finding and sanction.

35.     Mr. O'Connell opined that because "drug paraphernalia was in your living space … some level of responsibility on your part is reasonable."  O'Connell's reasoning and finding is not evident in Younger's record, and Mr. O'Connell, who worked at Kent State in 2013 during the incident, had no basis to make his own assessment because he had no direct experience of the investigation.

36.     CWRU sent Younger's full disciplinary record on June 27, 2019.  The record reflects that Mr. Beyer entered a finding of responsibility on March 21, 2013, even though Younger was never called to an "administrative hearing" until April 3, 2013.  He was found guilty prior to any opportunity to defend himself and prior to any investigation.  He was found guilty on the DRUGS charge alone.

37.     CWRU also imposed the formal sanction of disciplinary probation without ever notifying Younger.  Six years later, June 27, 2019, was the first formal notification Younger received

that he had been responsible for a drug violation and that CWRU had imposed a sanction. The drug violation which CWRU found him responsible for is also a crime in the state of Ohio.

38.     Younger could only think CWRU had made an administrative mistake. He wrote to CWRU on July 2, 2019 to correct the error and again requesting an appeal. He indicated that he had received no prior notification of the disciplinary decision and sanctions against him. Given the procedural irregularities, Younger asked CWRU to consider this request as a formal appeal of CWRU's finding and sanctions, which is provided under CWRU's rules within three business days of formal notification of finding and sanctions. Because Younger had received no notice until June 27, 2019, his submission of July 2, 2019 was timely.

39.     On July 22, 2019, CWRU's Associate Counsel Gabrielle Lincoff, CWRU Office of General Counsel stated that "the university does not find a procedural issue, nor has [it found] any documentation or reason to support the allegation that Mr. Younger never received notice." Thus, CWRU absolved itself of its arbitrary action against Younger despite finding no evidence of notice. In the absence of documentation that CWRU notified Younger, CWRU placed the burden on Younger to prove a negative.

40.     Attorney Lincoff further informed Younger that its 2013 Handbook was different from the current handbook available to Younger online, and that there were no procedural irregularities under the 2013 Handbook. CWRU thus absolved itself of the failure to follow its own policies by claiming that Younger had got the 2013 policies wrong. But CWRU's counsel could not provide the 2013 policies when asked. When Younger requested the 2013 Handbook, Attorney Lincoff could not provide it, stating that she was "still collecting the entirety of the 2012- 2013 CWRU policies." CWRU did not provide the 2013 Handbook until August 6, 2019. Even then, CWRU provided a 2013 Handbook in incomplete and truncated form.

9

41.     As the 2013 Handbook that CWRU did provide showed, CWRU maintained no rule of conduct in 2013 imposing collective responsibility for drug paraphernalia or other contraband found in common areas on campus or in dormitories.  In its communications with Younger, CWRU indicated no rule he had violated other than the supposed DRUGS rule.

**C.  The Policies and Conduct Process of CWRU**

42.     CWRU has established policies and handbooks that it promulgates to students upon their matriculation.  These policies and handbooks formed binding contracts between the University and the students upon the students' payment of tuition.

43.     The 2013 Handbook guaranteed all students certain due process rights in the event that its campus quasi-judiciary brought charges against them.

*1)  The University Student Affairs Hearing Process*

44.     One such policy is CWRU's "University Student Affairs Hearing Process," which has three steps:

**Step 1: Informal Process**

"Should informal discussion fail to resolve the problem, the Office of Student Affairs requests a written statement from the individual(s) accused and, if appropriate, arranges a hearing."

**Step 2: University Student Affairs Administrative Hearing**

In cases heard administratively, the following procedures apply:

1. A University judicial officer designated by the Associate Vice President for Student Affairs will notify the student of the date, time, and location of an administrative hearing with the Associate Vice President for Student Affairs or his/her designee.

2. The hearing is generally closed and includes only the accused student(s) and the Associate Vice President or designee.

3. The Associate Vice President for Student Affairs or his/her designee will review all information and testimony by the student(s) and make a decision.

10

4. The Associate Vice President or designee will notify the student(s) in writing of the decision and what sanctions, if any, will be imposed.

5. The student(s) will be informed of the right to appeal this decision.

**Step 3: University Student Affairs Judicial Board**

In cases heard by the University Judicial Board, the following procedures apply:

1. The student will be notified in writing of the date, time, and location of the hearing. Generally, a hearing will not be scheduled less than 48 hours after notification.

2. The University Judicial Board includes the following:

      a. the Assistant Vice President for Student Affairs or his/her designee

      b. an administrative representative from Undergraduate Studies

      c. one student

3. Hearings are closed and confidential.

4. A confidential record is made of the hearing.

5. All parties may request a submission of written factual accounts by witnesses and may request that the witnesses appear at the hearing.

6. An accused student may review any evidence that may be introduced 48 hours prior to the hearing.

7. The accused student may have an adviser of his or her choice. The sole role of this person is to advise the student. The adviser may neither address the board nor participate in the proceedings.

8. The accused student may hear and question all witnesses. Questions may be directed to the Chair of the University Judicial Board.

9. The accused student will be recalled after the deliberations if found responsible and if priors exist.

10. The University Judicial Board will make its decision promptly and notify appropriate parties in writing. Disciplinary sanctions will be disclosed to any person or persons who have been victimized by a student or students found responsible for an offense and to University personnel when appropriate.

11. The Chair will inform the student of the right to appeal the decision.

11

45. Mr. Beyer did not abide by the University Student Affairs Hearing Process.

46. Mr. Beyer purported to apply the HRLGL Hearing Process, but he failed to provide the minimal procedural protections to Younger and his suitemates under that policy as well.

*2) Housing, Residence Life & Greek Life Hearing Process*

47. The HRLGL Hearing Process is likewise a multi-step procedure, but it cannot decide serious cases implicating suspension or expulsion. The HRLGL Hearing Process provides:

> **HRLGL INFORMAL HEARING**: A Coordinator Contact is a first-level administrative hearing in which first-time violations of community standards may be resolved. A Coordinator Contact is an informal hearing in which a situation is mediated between a Residence Life or Greek Life Coordinator and the student allegedly involved in an incident. The Coordinator and the student will decide together how to resolve the situation and what appropriate sanctions, if any, will be applied. Sanctions that may be given during a Coordinator Contact include the following: a warning, restitution, fines, educational project, service project, or referral.

> **HRLGL ADMINISTRATIVE HEARING**: If the student contests his/her involvement in the incident and/or does not come to an agreement regarding the outcome of the Coordinator Contact, the student can request an HRLGL Administrative or Judicial Board hearing. In cases heard administratively, the following procedures apply:

> 1. The student will be notified by the hearing officer of the date, time, and location of an administrative hearing.

> 2. The hearing is generally closed and includes only the accused student(s) and the hearing officer.

> 3. The hearing officer will review all information and testimony by the student(s) and make a decision.

> 4. The hearing officer will notify the student(s) in writing of the decision and what sanctions, if any, will be imposed.

> 5. The student(s) will be informed of the opportunity to appeal the decision.

> **HRLGL JUDICIAL BOARDS**: The HRLGL Judicial Board is composed of undergraduate students who represent the residence halls and the Greek-letter organizations. All members must reside in university–owned residence halls or Greek houses. The board is advised by the Director of Residence Life or his/her

designee.  The Judicial Board hears cases referred by Residence Life or Greek Life staff involving infractions of the University Policies or the Housing Policies.

The HRLGL Judicial Board shall function through the Office of Housing, Residence Life & Greek Life and ultimately through the Office of Student Affairs. The jurisdiction of the HRLGL Judicial Board shall extend to and include only those incidents taking place in, about, and around any University housing or residential program.

In cases heard by the HRLGL Judicial Board, the following procedures apply:

1. The student will be notified in writing of the alleged policy violation(s) and the date, time, and location of the hearing.

2. Hearings are closed and confidential.

3. A single, confidential record will be made of the hearing.

4. A minimum of three (3) board members must be present for quorum to be met.

5. All parties may request a submission of written, factual accounts by witnesses and may request that the witnesses appear at the hearing.

6. An accused student may review any evidence that will be introduced prior to the hearing.

7. A student appearing at the hearing may have an advisor of his or her choice. This advisor may advise the student but may neither participate in the hearing nor address the board.

8. The accused student may hear and question all witnesses. Questions must be directed to the judicial board chairperson.

9. The board will make its decision promptly and notify appropriate parties in writing. Disciplinary sanctions will be disclosed to any person or persons who have been victimized by a student and to University personnel when appropriate.

10. The chairperson will inform the student of the opportunity to appeal the decision to the Housing, Residence Life & Greek Life Appeals Board.

3) *CWRU's Breaches of Policy*

48.    CWRU did not abide by its Conduct Process in erroneously finding Younger

"responsible" for a drug violation, including without limitation:

13

i.     CWRU's application of the HRLGL Hearing Process to Younger and depriving him of the procedural protections of the University Student Affairs Hearing Process and Judicial Board.

ii.     CWRU's failure to engage Younger in any informal process to resolve the dispute.

iii.     CWRU's failure to provide Younger with an opportunity to resolve the DRUGS charged informally under Step 1 of the HRLGL Hearing Process that Mr. Beyer purported to apply.

iv.     CWRU sanctioned Younger with a disciplinary sanction and finding even though an HRLGL Hearing Process had no authority to do so.

v.     CWRU's failure to provide Younger a hearing before University judicial officer designated by the Associate Vice President for Student Affairs.

vi.     CWRU's failure to provide Younger with the opportunity of a full and independent hearing before CWRU's Judicial Board comprised of the Assistant Vice President for Student Affairs, a student, and an administrative representative from undergraduate studies.

vii.     CWRU's failure to provide Younger an opportunity to present witnesses and other exculpatory evidence, in particular the witness and fellow suitemate who confessed.

viii.     CWRU's failure to provide Younger with a decision letter.

ix.     CWRU's failure to notify Younger of his right to appeal.

x.     CWRU's failure to provide Younger with an opportunity to appeal.

xi.     CWRU's entry of a finding of responsibility before Younger had an opportunity to be heard.

xii.     CWRU imposed a disciplinary sanction on Younger through its HRLGL Process, which only had authority to impose housing sanctions.

xiii.     CWRU found Younger responsible for violating its DRUGS rule in the absence of any evidence that he had violated any element of the rule and in defiance of evidence that showed he had not.

xiv.     CWRU disregarded the requirement to apply the preponderance of the evidence standard.

14

49.     In 2013, CWRU had promulgated a rule against the possession of drugs and

paraphernalia, which defined a violation of campus rules as follows:

> DRUGS
>
> The use or possession of drugs is illegal except when prescribed by a physician.
> University cannot protect students from prosecution for violation of federal or
> state laws.  Case Western Reserve University does not condone the illegal
> possession, consumption, provision, or sale of drugs.  The University has a strong
> obligation to make readily available to students full information about the use and
> effects of all drugs, and to make available sources of counseling to those who are
> using or have used drugs.  Definitions of controlled substances are available as part
> of the Ohio Revise Code and are included in the University's Drug-Free School
> Notification.  The following behavior is prohibited:
>
> > 1. Illegal consumption or possession of drugs.
> >
> > 2. Illegal provision or merchandising of controlled substances, including
> > prescription drugs.
> >
> > 3. Possession of drug paraphernalia, including, but not limited to, bongs,
> > pipes, and hookahs (drug paraphernalia will be confiscated and forfeited even
> > if not being used for the purposes of consuming illegal substances).
> >
> > 4. Malicious use of drugs intended to cause harm to oneself or others.

50.     CWRU's finding of responsibility is erroneous, arbitrary, and capricious on its face.

By its plain language, CWRU's 2013 DRUGS rule prohibited the possession, consumption,

merchandising, or malicious use of drugs.  But it did not include any provisions for finding students

"guilty by association."  The DRUGS rule, the sole rule invoked against Younger, does not provide

for collective responsibility when paraphernalia is discovered in common areas and another student

admits to its possession.  It does not provide for responsibility merely because students know that

others may possess contraband.  CWRU and Mr. Beyer knew the makeshift bong made from a

Mountain Dew soda bottle did not belong to Younger.  Another suitemate of Younger's came

forward and admitted it was his.

51.     Two supervisory federal law enforcement officers have informed Younger that the finding of responsibility in 2013 on his application will negatively impact his application for employment with federal law enforcement agencies.  CWRU's arbitrary action has therefore damaged Younger's future career.

52.     In addition to applying to agencies of federal law enforcement, he applied to numerous law schools, whose standard applications instruct:

> The first, and most important, item … requires you to have a complete and accurate law school application that provides ***disclosure of any legal violations, college disciplinary matters or similar issues***, including any that may have occurred after the time you submitted your application but before enrollment. State boards of bar examiners will note of any issue disclosed on your bar application that occurred before you enrolled in law school and specifically ask the Law School whether we were made aware of that issue when you enrolled. If an inconsistency exists between information obtained by the bar examiners and your law school admission application, that inconsistency could potentially impact your admission to the bar.

CWRU has now placed Younger in the position of having falsely reported his disciplinary record on law school applications.

## COUNT I

### (Breach of Contract)

53.     Younger realleges and incorporates all preceding paragraphs as if fully restated here.

54.     Younger and CWRU entered into implied and express contracts upon Younger's matriculation in 2010, including but without limitation, contracts comprised by the policies and handbooks promulgated by the University.  CWRU is bound to follow its own rules.

55.     Younger performed all his obligations under the express and implied contracts entered into with CWRU.

56.     CWRU breached its contract with Younger by erroneously finding Younger "responsible" for a drug violation, and specifically breached its policies as follows, without limitation:

i.    CWRU's application of the HRLGL Hearing Process to Younger and depriving him of the procedural protections of the University Student Affairs Hearing Process and Judicial Board.

ii.   CWRU's failure to engage Younger in any informal process to resolve the dispute.

iii.  CWRU's failure to provide Younger with an opportunity to resolve the DRUGS charged informally under Step 1 of the HRLGL Hearing Process that Mr. Beyer purported to apply.

iv.   CWRU's failure to provide Younger a hearing before University judicial officer designated by the Associate Vice President for Student Affairs.

v.    CWRU's failure to provide Younger with the opportunity of a full and independent hearing before CWRU's Judicial Board comprised of the Assistant Vice President for Student Affairs, a student, and an administrative representative from undergraduate studies.

vi.   CWRU's failure to provide Younger an opportunity to present witnesses and other exculpatory evidence, in particular the witness and fellow suitemate who confessed.

vii.  CWRU's failure to provide Younger with a decision letter.

viii. CWRU's failure to notify Younger of his right to appeal.

ix.   CWRU's failure to provide Younger with an opportunity to appeal.

x.    CWRU's entry of a finding of responsibility before Younger had an opportunity to be heard.

xi.   CWRU imposed a disciplinary sanction on Younger through its HRLGL Process, which only had authority to impose housing sanctions.

xii.  CWRU found Younger responsible for violating its DRUGS rule in the absence of any evidence that he had violated any element of the rule and in defiance of evidence that showed he had not.

xiii.    CWRU disregarded the requirement to apply the preponderance of the evidence standard.

57.    Younger has suffered damage to his reputation and ability to apply for government jobs that require security clearance.  Furthermore, because of CWRU's breach, Younger has damaged his career by reporting that he was not found guilty for drug violations to federal agencies and to law schools, among others.  CWRU's erroneous finding impedes and damages Younger's career in federal law enforcement and as an attorney, among others.

## COUNT II

### (Promissory Estoppel)

58.    Younger realleges and incorporates all preceding paragraphs as if fully restated here.

59.    CWRU made a promise to Younger through its agent, Christopher Beyer, CWRU's Manager of Upper-Class Residents and Assistant Director of Residence Life, one of CWRU's burgeoning officials in its administrative bureaucracy and quasi-campus judiciary.

60.    At what Mr. Beyer styled an "administrative hearing" on April 3, 2013, Mr. Beyer promised Younger in clear and unambiguous terms that, if Younger identified the owner of the makeshift bong discovered in House 7, he would not be found responsible for the possession of drugs.

61.    Mr. Beyer further wrote to Younger on March 22, 2013, "Your best recourse is to speak with your roommates and express your expectation that the responsible person (or people) contact me to claim responsibility so that the rest of you don't have to go through this again."

62.    Younger reasonably relied on Mr. Beyer's promises and assurances and disclosed to him the owner of the drug paraphernalia in a meeting with Mr. Beyer on April 3, 2013.

63.     Mr. Beyer broke his promise to Younger by entering a finding and sanction for responsibility under CWRU's conduct code, under the section titled DRUGS.  The record also showed that Mr. Beyer entered the finding of responsibility prior to even meeting with Younger on April 3, 2013.

64.     Younger's reasonable reliance on Mr. Beyer's promise has caused him injury. Younger has suffered damage to his reputation and ability to apply for government jobs that require security clearance.  Furthermore, because of CWRU's breach, Younger has damaged his career by reporting that he was not found guilty for drug violations to federal agencies and to law schools, among others.  CWRU's erroneous finding impedes and damages Younger's career in federal law enforcement and as an attorney, among others.

## COUNT III

### (Breach of the Covenant of Good Faith and Fair Dealing)

65.     Younger realleges and incorporates all preceding paragraphs as if fully restated here.

66.     Every Ohio contract imposes an implied duty of good faith and fair dealing in its performance and enforcement.

67.     As pleaded above in Count 1, express and implied contracts existed between the parties.

68.     Younger performed his obligations under the parties' express and implied contracts.

69.     CWRU engaged in conduct without good faith and for the purpose of depriving Younger of the rights and benefits of his contracts with CWRU, including but not limited to the following:

    i.    CWRU's application of the HRLGL Hearing Process to Younger and depriving him of the procedural protections of the University Student Affairs Hearing Process and Judicial Board.

19

     ii.     CWRU's failure to engage Younger in any informal process to resolve the dispute.

     iii.     CWRU's failure to provide Younger with an opportunity to resolve the DRUGS charged informally under Step 1 of the HRLGL Hearing Process that Mr. Beyer purported to apply.

     iv.     CWRU's failure to provide Younger a hearing before University judicial officer designated by the Associate Vice President for Student Affairs.

     v.     CWRU's failure to provide Younger with the opportunity of a full and independent hearing before CWRU's Judicial Board comprised of the Assistant Vice President for Student Affairs, a student, and an administrative representative from undergraduate studies.

     vi.     CWRU's failure to provide Younger an opportunity to present witnesses and other exculpatory evidence, in particular the witness and fellow suitemate who confessed.

     vii.     CWRU's failure to provide Younger with a decision letter.

     viii.     CWRU's failure to notify Younger of his right to appeal.

     ix.     CWRU's failure to provide Younger with an opportunity to appeal.

     x.     CWRU's entry of a finding of responsibility before Younger had an opportunity to be heard.

     xi.     CWRU imposed a disciplinary sanction on Younger through its HRLGL Process, which only had authority to impose housing sanctions.

     xii.     CWRU found Younger responsible for violating its DRUGS rule in the absence of any evidence that he had violated any element of the rule and in defiance of evidence that showed he had not.

     xiii.     CWRU disregarded the requirement to apply the preponderance of the evidence standard.

70.     When CWRU was notified of its erroneous findings and breach of its promises to Younger, CWRU denied Younger an appeal and refused to alter its erroneous findings.  CWRU, by its own admission, has no evidence that it ever notified Younger of disciplinary sanctions and

findings, yet blames Younger.  CWRU places the burden on Younger to prove a negative: namely, that he **did not** have notice.

71.     Younger has suffered damage to his reputation and ability to apply for government jobs that require security clearance.  Furthermore, because of CWRU's breach of contract, Younger has placed his career at risk by reporting that he was not found guilty for drug violations to federal agencies and to law schools, among others.  CWRU's erroneous finding will bar Younger, who stands at the beginning of his career, from a career in federal law enforcement, among others.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Adam Younger prays that this Honorable Court grant the following relief:

  i.   Judgment in favor of Plaintiff and specifically: On Counts I-III, an Order vacating the discipline imposed on Younger and awarding damages in an amount to be determined at trial;

  ii.  Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees

**JURY DEMAND**

PLAINTIFF ADAM YOUNGER DEMANDS A TRIAL BY JURY
ON ALL CLAIMS SO TRIABLE

Respectfully submitted,

/s/ Joshua A. Engel

Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Michael Thad Allen, Esq.
        *Pro Hac Vice* Motion To Be Filed
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738
m.allen@allen-lawfirm.com